So our next case for argument is Tritool Inc. versus E-Bank and Kipperman, I guess, whatever. Pardon me, sir? Tritool? Yes, it's the Tritool case. It's in the matter of SEC versus Copeland. Yes. Okay. Tritool will party in interest. Good morning, Your Honor. Good morning, Justice Wendt and Justice Pegerson. If it may please the Court, I am Raleigh Peterson. I'm Tritool's attorney. I represent them. We're appealing orders of the Honorable Manuel Real in the matter of SEC versus Copeland, a receivership proceeding. I would like to request to reserve two minutes for rebuttal. In October of 2011, the U.S. District Court entered a judgment for a permanent injunction in this receivership case. In doing so, it appointed a permanent receiver to marshal the assets of the case. The basis of this injunctive, really, was Charles Copeland's, a CPA's, his apparent Ponzi scheme involving many entities that he had formed, putting his clients into the entities as investors. During the early stages of the SEC proceeding, the SEC receiver moved the court, to consolidate all of these entities into one to allow the receivership to administer the entities as one estate, instead of several different entities, and to marshal the assets, pool the assets, and then pool the liabilities. The District Court refused that motion. Let me ask you something, Counsel. Tritool never pursued a stay of the distribution. Is that correct? No, that's correct, Your Honor. Now, look at the practicalities of it. Distribution's done. Money's gone. Receiver's role is completed. Is that right? Well, in essence, no, Your Honor. And what I'd like to say in that regard is this, is that Tritool filed a motion under Winkie, okay, to essentially have the blankets stay lifted and allow Tritool to proceed in state court action. Right. No, I understand that, that you tried to modify the stay so that you can go back to state court and then continue the claim there, so that was denied. And then the receiver was going to essentially distribute the CP18 funds, and you didn't ask for a stay of distribution, so now it got distributed. That's not correct, Your Honor. Tell me what's not correct about that. Well, what SEC did in that regard, or what Tritool did in that regard, is this, is that they filed their motion almost simultaneously with the court hearing Tritool's motion to lift stay. Within a week, Tritool filed a motion asking, you know, objecting to the distributions, okay? And I want to read from the prayer for relief in that motion. It was, in sum, due process requires showing, allowing Tritool a right to assert its claims in a meaningful manner before a neutral trier of fact. The receiver mischaracterized documented facts, demonstrates he is an advocate. Tritool's fate cannot rest by way of its arbitrary determination of its status. Accordingly, this court should either grant Tritool that right, okay, and postpone distribution of any of CP18's assets until Tritool has provided its right or ordered the receiver to not distribute any funds until Tritool can perfect an appeal. So the district court had a hearing on the distribution and on your objection, correct? The district court did. Overruled your objection, ordered the money distributed. Did you ask for any kind of stay at that point? Well, this motion itself. No, no, no, no, no. After the district court entered the order approving the distribution, did you ask for a stay? Did you go to the district court and ask for a stay? Did you come to the Ninth Circuit and ask for a stay? During the interim of this, we did come to the Ninth Circuit with a writ and seeking a writ to ask the district court to or instructing the district court to let the stay. I'm not talking about a stay. I'm talking about a stay on the distribution. Yes, Your Honor. I didn't see it as being necessary in effect in that the district court had ruled on the motion. The specific motion was to keep the receiver from distributing the assets. So let me ask you this. There was about $2 million that was a little over $2 million that the receiver wanted to distribute to the CP18 claimants. CP18, Your Honor. Yes, Your Honor. And my understanding, and you can correct me if I'm wrong, my understanding is that money was paid out, right? Eventually, the receiver distributed the funds, correct? Right. Okay. Is there anything left? I'm not sure, Your Honor. Well, we know that there was a hold back of about $700,000. We also know that there was about $3.1 million that was collected as far as the receiver did with CP18. Well, the receiver had to give a full accounting. Sure. Correct? Sure. And we know, I remember reading at some part that they held back about $700,000 to pay for closing up expenses. The lawyers and everybody else has to get paid and all of that. Is there anything left today? Do we know? Well, Your Honor, the bigger issue here is the collateral estoppel effect. Well, I'm just saying. No, no, no, no, no. I don't know. Do you know if there's anything left today?  What relief, let's assume you prevail. What relief are you seeking? Well, the relief that we're seeking here, Your Honor, is that this court set aside the two orders, okay? The orders, I think, were an abuse of discretion, particularly the order where Judge Riel decided the merits of this case without affording a plenary hearing on the matter. But what's going to happen now? If the money's been distributed, what's going to happen? Like, take us through what's going to happen if this case is sent back. Yes, Your Honor. What's going to happen is that I will pursue a constructive trust remedy against the distributees of the money. You claw it back. You get it back. That's correct, Your Honor. You claw it back. Yeah. Yes, Your Honor. Assuming you could prevail on your claim. Correct. That's exactly correct. Okay. So this was an equitable proceeding, correct? Yes, Your Honor. What was wrong with what the district court did? Well, the district court did not in any fashion afford TriTool an opportunity to have a hearing on its rights, a plenary hearing. In fact, TriTool is entitled to a jury trial. This is a common law right. And if the court starts with the analysis of Winkie I and carries it through to Winkie III and the analysis of Arizona Fuels and Universal Financial, in all those cases, in Superior Court or Superior I, this court stated that you could not impose an injunction against third parties unless you afforded them a right, okay, to have that relief or that injunction lifted at some time. And Winkie II essentially stated precisely that. It's not a matter of if. It's a matter of when. In a very, very similar case was Winkie II. And in Winkie II, the receivership had gone up for quite a period of time. And the lawyers went, you know, filed their motion for relief from state. The judge denied it, okay. The estate was close to at the end of its life cycle. And this court found that it was an abuse of discretion not to lift that stay, okay. And not only that, but the judge in that particular case took, well, the lawyers are arguing, anytime you're dealing with an injunction, you're arguing, you know, whether there's a, you know, merit in the case. And in this type of analysis, it's do you have a colorable claim. And so you objected. So you objected to the proposed distribution, correct? What I objected to. And you put together a whole packet of material for the district court to lay out the basis for your claim against the fund, right? Yes, to show a colorable claim. Right. And presumably the district court considered it. Well, the district court took and weighed conflicting evidence without allowing any cross-examination of any kind, which is a pure violation of due process in and of itself. I mean, cross-examination has been considered to be the greatest engine of truth-finding in our judicial system. And beyond that, didn't allow a jury trial, which is afforded by the Seventh Amendment. So is there any case authority that would support your argument that the district court was required in this equity proceeding to conduct a full-on evidentiary hearing to determine the validity of your claim? Yes, Your Honor. And I believe that Arizona Universal Financial provides precisely that. And I've cited it in the brief. And Universal Financial is a case in which an equitable receivership, there was many, many claimants in the case. And what the judge did there was very astutely, he categorized each one or all of the various types of claims. Then he proceeded to try 12 cases, okay? And out of those 12 cases, then applying collateral estoppel, I assume, found the facts in the remaining cases that weren't actually tried and made a summary determination, okay? And, in fact, Universal was discussed later on, and I believe it was discussed in Winkie III, whereby they said that Universal, you know, you can't look at it. Well, I imagine a court could do that. I don't see anything. If the court chose to do that, that would be fine. But my question is, is there any case law that says the court must do that in ruling on a third-party claimant's objections? I think Winkie II provides precisely that result. You know, I don't think just because you're in a receivership equity position that you lose your constitutional rights. The Constitution doesn't go out the window just because you end up in a court of equity. And, in fact, you know, a court of equity, when you're standing in front of a court of equity, because it's an equitable proceeding, does not necessarily make, you know, stand for the proposition that you've given up your right to a jury trial. Well, it is a real equitable proceeding here. There's no question about it, and I would not even try to, you know, make any kind of an argument otherwise. It would be foolish. I mean, it is an equitable proceeding. Because you put your place, you know, your position, you just get in line with everybody else. That's not true, Your Honor. I think when the injunction was initially issued in this case, okay, the order specifically had to provide for relief. It had to provide tri-tool and other people in similar situations with tri-tool. But you could file a claim. It allowed you to file a claim. It goes beyond that, Your Honor. It states that before that injunction can be granted, you must be given the opportunity to get relief from it. And that presumes that when you step in front of a court of law, that you will have plenary rights, you will have your constitutional rights, that you'll have a right.  Even assuming you have a claim, the amount of money you get gets mixed in with all the other money. You bet. You know what? I'm a creditor, and a creditor's claim under California state law takes precedent over investors, as does all the partnership agreements that were involved in this. Each one of these partners, investors, signed an agreement saying that guess who gets paid first? The creditors. Why didn't we get paid? We didn't have a liquidated claim. If we decide that summary proceedings are fine, that they do comport with due process so long as you have notice and an opportunity to be heard, did you have notice and an opportunity to be heard in this case? There was extensive briefing filed in this case. No question. We had opportunity to be heard, but what was that opportunity? The opportunity to give rise to due process of law. There was no opportunity to present witnesses, to put on expert forensic examiners, to cross-examine the receiver. In this particular one, there's an example that's, you know, in the initial motion to lift the stay, the receiver was arguing that there was not a colorable claim because the statute of limitations had run, and that CP3 got consideration, you know, for the $1.8 million that transferred to CP18. And the way he argued that was that CP3 got an interest in essentially CP18. Then later on, doesn't give CP3 any recognition as a creditor of the CP18 estate. So, I mean, cross-examination, showing the books and records, you know, of the company, showing that these obligations were booked on each one of these entities as loans, okay, you know, clearly in front of a trier of fact, trier of fact's going to look at that and evaluate it instead of just brushing it aside is what happened in this case. Okay. You're just about out of time. I'll give you a minute for rebuttal. Thank you, Your Honor. Good morning. I may have pleased the court. I'm John Stevens, appearing on behalf of the liquidating trustee successor to the court-appointed receiver. There are three points I'd like to address, but I think the court has cut to the essential parts of this. First question is, of course, is a summary proceeding acceptable in an equitable receivership as this one was? And I think the case law is fairly clear that, yes, summary proceedings are appropriate. There are circumstances, although I think even by the appellate court's admissions, that there isn't a lot of law in this regard. The Arizona Fuels case acknowledged that, but still the authority is pretty consistent that in equity receivership, summary proceedings are appropriate. A question has been left open whether in some circumstances a plenary proceeding might be acceptable. Those are proceedings where there is a direct dispute between the receiver and a holder of property, and we've seen cases like that. It was not unlike the universal case that the SEC had where there was disputes over actual loans, over notes. In this case, that's not what we have with TriTool. We had dozens of people involved in this case. Most of them had far more invested than TriTool. TriTool had a $200,000 claim. Some of these individuals had as much as $500,000. Most of those people did not get much back. We did our best to bring the money in, but again, TriTool, getting back to the plenary proceeding and the right to a jury trial, TriTool had a claim. Its claim was against CP3. TriTool obtained this conditional promissory note because there was a lien on its property and they wanted $200,000 if the lien wasn't removed. That did not give it a claim to CP18. It did give it a claim against CP3. CP3, of course, has nothing left because CP3 sold its property and distributed out the proceeds of that sale as it should. All of that happened before TriTool's claim even had ripened. You can still have a fraudulent transfer even in that circumstance. Correct, and I'll get to that in just a minute, but there really wasn't a fraudulent transfer when you track back what happened. Again, this was a Ponzi scheme of sorts. But the fellow operating this Ponzi scheme did have pretty good records, and as a result of those records- Was the fraudulent transfer issue, was that waived? Was the fraudulent transfer issue waived? No, we addressed it head on. There was a hearing on that. There was the motion for relief from stay, which was denied. TriTool wanted to drag several of the receivership entities into state court where CP3 is a defendant. The judge had to weigh that versus what was going to be the appropriate equitable approach to this case and denied that motion, and with good reason, considering as well whether or not there was this fraudulent claim. Then we went forward with the actual distribution, and that did occur. CP18's assets- No money left, and it would have to be by way of clawback proceedings? Correct. And TriTool has sued all of the people that received distributions, not only from CP3, but now also CP18, so all those people are now before the state court. But to answer your question, CP18's assets have been distributed, and the only money that's remaining now is money being held by what was the general partner, because we had this common general partner for all these single asset limit partnerships. So there is money remaining for the general partner, which was this CRI, Copeland Realty, Copeland Wealth Management Real Estate. Same thing, just successors. But they are the general partner. They were the general partner, and the receiver and liquidating trustee have stood in the shoes of the general partner. So those assets are now held by the liquidating trustee now, formerly the receiver, on behalf of the general partner, not CP18. But, Judge Peterson, getting back to your question of was there a fraudulent transfer, there were two loans that were disputed by TriTool. One of them was a loan from Pacific Western Bank. This occurred in February 2007. And what occurred here basically was an equity loan. That was the $1.795 million, huh? Correct, Your Honor. It was $1.8 as applied for after fees were taken out of it, $1.795. There's no question that CP3 obtained that loan and transferred that money to CP18. I would have to think the full expectation that it would be spent to acquire CP18's property. But it was fully accounted for. There were receivables and payables on the books and records of both entities. CP18 had a payable to CP3. CP3 had a receivable from CP18 for the full amount of the money. Important fact here, this was February of 2007. In March of 2007, CP18 acquired this property, this North Carolina property. And as part of that, there was the second loan or the second transfer made, and that was the money to pay for this carryback. Again, these are fairly common commercial transactions other than the number of players involved. So we have the equity loan passing through, and we have a carryback that CP3 pays off. Again, that obligation was fully documented on the books and records. This was a $333 approximately value note. That was accounted for on the books of CP18 as an obligation to CP3. That was paid to CP3. CP3 did pay that, Your Honor, and got a receivable as a result of that for the full amount. So this is now, even though we have this character Copeland, he's fully documenting these things in this regard pretty carefully. And what happens ultimately is in March, I'm sorry, April, we now move forward to April, same year, 2007, CP3 sells this property, and several things happen. TriTool was the purchaser of that property. TriTool got this conditional $200,000 note. Along the way, though, CP3 now has its investors to pay off. It now has sold its asset. This is several months after the loan from Pacific Western Bank, so it can be no claim by TriTool that that was a fraudulent transfer because it wasn't even a creditor at the time. However, TriTool can at least arguably claim to be some rights as to the Pacific Western Loan Bank loan because that happened shortly after it closed its transaction. But now focusing only on what happens with this sale of CP3's property, CP18 now owes CP3 $1.795 million. CP3 owes all its investors for their investments. So what happens is CP3 transfers those assets, that obligation to the investors. They then become investors in CP18 to the tune of a little more than $1.7 million. Very little left of that $1.795. So CP3 now is the creditor of CP18, has taken care of that by giving its obligees for its investors the roughly $1.7. They now become investors, so that takes care of almost all of the debt. The only debt remaining at that point is this Wendover transfer. So we know that the first one was... That's $330,000. $330,000 plus the remaining money that hadn't been paid off because the investors only got $1.7 instead of $1.95. But the total now with the $330,000 now becomes a little over $400,000. So again, as a result of what happened with the CP3 transaction, CP3 also had an obligation not just to its investors but to the general partner. General partners typically do have rights in these properties. And in addition to that, and this is a very important fact, the property that TriTool got included a parcel owned by the general partner. TriTool got that. The general partner had not been paid. So now we have CP3 with not only the obligations to its investors that were taken care of by this novation with CP18, we also have CP3 with the obligation to pay off Copeland Real Estate for this interest in land and its interest in the partnership. That then was taken care of by instead of having CP3 pay the general partner, have CP18 do it. Now CP18 owes that money instead of to CP3 to the general partner. So CP3 now has cleared its books, properly so, in a straight commercial transaction, and all the parties that were entitled to money got their money. So there couldn't have been fraudulent transfers because there was value for every transaction that occurred. They were well documented, and I've cited you the record. Granted, there is a lot of tedious transactions in this, but I've tried my best to simplify the transfers to show that there was value received at every turn. And there could not have been a fraudulent transaction because of the value received. But there was another point made earlier by the court that as part of this equity receivership, there was the motion for relief from stay, that was denied, but there was after that the motion to distribute the assets. Again, the receiver is doing his best to collect as much as he can and pay it out to the people that are rightful creditors. Tritool did not have a direct claim as to CP18. The other investors did. The lien holders did. Tritool hadn't perfected its lien even against CP3. There was nothing recorded, no security. They were simply trying to get into that pot of money held by CP18 and using these transfers that had been made, fully documented, legitimate transfers, as an avenue to get into that pool of money. The claim was denied by the receiver. We argued to the court that there was no fraudulent transfers. We argued to the court that Tritool did not have a legitimate claim. The court accepted that and did authorize the distribution of the money, and there was no stay. And not only that, but later, there were additional distributions made to other entities by the receiver, and ultimately the receivership itself was canceled. It was terminated, and the liquidating trustee was appointed. At that point, Tritool didn't file any opposition to the motion to terminate the receivership either. So Tritool just allowed this all to move forward, knowing that the receiver, on the other hand, had an obligation and was moving forward with that obligation to pay as many people as properly could be paid. The last point that I'd like to make is, in light of the history of all these transactions, there could be no fraudulent transfer because of the value received. But the district judge, Judge Reel, also concluded, as he properly should have, that with this four-year statute of limitations for fraudulent transfers, the first Pacific Western Bank loan that was transferred, the $1.79 million, had to have been barred. That was done in February 2007. Bargate would have been February 2011, four years later. Tritool hadn't raised a claim at all because the receivership actually hadn't even existed at that point. That claim was exhausted. It was barred. There was a second claim, though, of fraudulent transfer made against Wendover. Now, the timing here is a little tighter, but I think ultimately we reach the same conclusion. The Wendover note occurred as a result of CP18's purchase. But the payoff of that by CP3 didn't occur until late in April 2007. And in the meantime, CP3 had sold its property. So what CP3 did was... I'm sorry, what Tritool did was, after its note wasn't paid years later because the lien wasn't removed, it filed a lawsuit in state court. And ultimately it filed an amended complaint in April of 2011, just a few weeks before the CP... I'm sorry, before the Wendover note was issued. There was a question there whether or not, therefore, the amended complaint would relate back if the Doe allegations would support a claim against CP18. But if you look at that complaint, final point, and I think it's really honestly a minor point, but if you look at the second amended complaint and look at the Doe allegations, they don't support a claim against CP18. It only supports a claim against the CP3 creditors, who already had been sued. So ultimately, all the claims were barred by the statute. These are stale claims. These relate back to transactions in 2007. The receiver did the best he could. What happened to Tritool is not unlike what happened to a lot of other folks. There just was not enough assets to get everybody paid, and that's the reason we ended up in receivership. How much money is actually left? Right now, very little has been spent. I think a little over $600,000, and we do intend to make further distributions to people in those entities, not CP18, but there are other entities where there are claimants who will be paid with the remaining funds, and we do hope to get it tied up as quickly as possible. Thank you. Okay, thank you. I'll give you a minute for rebuttal. The description of the non-fraudulent transfer is kind of amusing in the sense that it skips one big block in it, and that's that CP3 is a separate entity. If the court were to buy that it was not a fraudulent transfer because the investors and the company went over here and set up a new company, CP18, and left all of its creditors behind. That's a classic fraudulent transfer. You can't do it. That's precisely what they did here. Instead of crediting accounts, what they did was for that note that was being held, that CP18 note, that separate entity that sat over here until essentially the 6th of April of 2007, that note sat on the books and then was credited against the entity giving it to not the entity CP3, but to the investors. Okay? I mean, it's just classic. You can't do that, and if you could, I mean, people would be able to fraudulently transfer assets from company to company and avoid creditors and payment of creditors in just every single instance. So it is not. These are hotly disputed facts. It's obvious from what we're talking about here. The statute of limitation issues are hotly disputed because they're disputed facts. TriTool was entitled to have a plenary hearing, to be able to cross-examination, to have a trier of fact hear these facts and make a determination. Last point. The Doe defendant allegation, okay? TriTool was within the 4-year statute, okay, on that. It didn't mean to name anybody as a Doe defendant. It can name anybody at that point that is still liable, and so that disposes of the argument as far as the $333,000 being, you know. Okay. Thank you very much, Counsel Will. This matter is submitted at this time, and we'll move to our final case for the morning.
judges: Pregerson, Paez, Nguyen